## HAMMETT v. NOOTER CORP.
### No. 28784.

St. Louis Court of Appeals. Missouri.

Jan. 19, 1954.

Rehearing Denied March 12, 1954.

Not to be reported in State Reports.

Renderer, Nolde & Kleinschmidt, St. Louis, for appellant.

Carl A. Enger, St. Louis, for respondent.

BENNICK, Judge.

This is a proceeding under the workmen's compensation law. Sections 287.010 to 287.800 RSMo 1949, V.A.M.S. The appeal is by the employer and self-insurer, the Nooter Corporation, from the judgment of the circuit court affirming an award of the industrial commission in favor of Charles Hammett, the employee.

The employee was injured on July 23, 1951, at the employer's plant in the City of St. Louis, and there is no question in this court but that his injury was by accident arising out of and in the course of his employment.

The referee found that the employee had suffered a sprain of the lower back with no permanent injury, and awarded compensation for temporary disability only at the rate of $25 a week for a period of 5 weeks.

The employee thereupon made application for review by the full commission, which found that he had sustained a 15% permanent partial disability of the body as a

whole, and awarded him compensation for permanent partial disability at the rate of $25 a week for 60 weeks.

The commission made a further allowance of $12.24 for medical aid, such allowance constituting reimbursement for the cost of a sacro belt which the employee had purchased on the recommendation of one of his physicians, and which the commission found was necessary to cure and relieve from the effects of his injury.

The basic contention on this appeal is that the circuit court erred in affirming such award for the alleged reason that the award was not supported by competent and substantial on the whole record, but instead was against the overwhelming weight of the evidence.

The principal attack upon the sufficiency of the evidence to support the award is directed at the finding that the employee had sustained a 15% permanent partial disability of the body as a whole.

The employee had worked for the employer for something over 4 years before the accident, and during all of that time had been assigned to what was known as the metalizing department, where he operated a lathe which was used in spraying metal.

The lathe itself is a little better than 3 feet in height, and has an overhead exhaust hood attached to the back of the lathe which lifts up to a point about 6 feet above the floor. In the ordinary operation of the lathe it is necessary at the beginning of each job to raise the hood in order to insert the pieces of metal which are to be sprayed; and when making such adjustments it had been the employee's practice in getting in a position where he could reach the hood to step upon the handle of a wheel which he turned by hand in the course of his work so as to cause the lathe carriage to move up and down. The wheel was about a foot in diameter, and the handle which the employee grasped to turn the wheel extended out from the wheel about 4 inches. On the occasion in question the employee's right foot slipped off of the handle as he was stepping down upon it

after completing an adjustment of the hood; and as he lost his position he fell a distance of 2 feet to the concrete floor below, where his right leg collapsed under him when his foot struck the floor, causing him to topple over upon the right side of his body.

Some 10 or 15 minutes after his fall the employee experienced a sharp pain in his back, which persisted for the remainder of the day. Upon feeling the pain he reported the occurrence to his foreman, and was advised to consult the company nurse, who in turn sent him on to the personnel manager. What the employee apparently had in mind was to obtain permission to go to a certain osteopath to whom the company had sent him on several prior occasions; and when it was ascertained that the particular osteopath had moved his office to a point quite distant from where he had formerly been located, the employee was told by the manager of his department that he might call upon an osteopath with an office in his own immediate neighborhood. As a matter of fact he went for treatment to such an osteopath that very night, and was given a letter in which the osteopath recommended to the company officials that he be hospitalized. Although the employee presented the letter to the manager of his department, nothing whatever came of it, and on the fourth day after the accident, at the suggestion of his attorney, he consulted Dr. R. A. Mezera, a specialist in industrial and internal medicine.

Dr. Mezera first saw the employee in his office, and after taking his history and making a cursory examination, he recommended that the employee enter a hospital for a thorough diagnostic examination. He arranged for the employee's admittance into St. Anthony's Hospital; and inasmuch as the injury involved a tipping of the vertebral column, he called in Dr. Frank Palazzo, a neuro-surgeon, as consultant. The employee remained in the hospital for 2 days, and next visited Dr. Mezera in the following September. His last examination by Dr. Mezera was on January 8, 1952, just 2 days prior to the hearing before the referee. He saw Dr. Palazzo on several occasions after leaving the hospital, the last time being January 9, 1952, the day immediately preceding the hearing before the referee.

After leaving the hospital the employee remained at home for 5 weeks before attempting work of any kind, and then obtained employment from a company referred to as Chevrolet-Shell at the same general type of work as that which he had been doing for his former employer. He was still in the employ of Chevrolet-Shell at the time of the hearing before the referee. Upon his discharge from the hospital he had been given a letter by Dr. Palazzo recommending that his employer put him back to work on light duty, but after some dispute with the manager of his department, he gave up the idea of going back on his old job and instead secured the new employment.

Much of the controversy at the present time grows out of the fact that the employee had had other injuries to his back before the one which has given rise to this proceeding. As a matter of fact, the employee stated at one point in his testimony that he had sustained 4 or 5 previous injuries to his back while in the service of the employer. It appears, however, that only one of such injuries was of any particular significance, this being an injury sustained about 3 years previously when the employee's foot slipped while he was engaged with another workman in carrying an acetylene tank. The employee testified that after such injury the employer had supplied him with a brace which he had worn until it was destroyed by fire a year or more before the hearing in the present case.

The employer argues in this court that the employee's condition now is exactly the same as it was before the accident of July 23, 1951; that the only change in his condition as the result of the accident was the 5 weeks' temporary disability for which the referee undertook to limit his compensation; and that in any event his evidence failed to show with reasonable certainty that his alleged disability was permanent. Tied in with all these matters is the further contention that under the employee's own

evidence his disability may have been due to one of two or even several accidents; and that he failed in his proof that his disability was due to an accident for which the employer would now be liable to pay compensation.

The employee testified that his back pained him at his work whenever he was subjected to a strain as by bending over to pick up some heavy object or by reaching out over his lathe, and that he occasionally woke up at night with a pain in his back. He testified further that he could not bend over as well as he could before the accident, and that he was not able to perform all his duties as well as he could before the accident due to the necessity that he avoid any effort that might produce another injury which, if it should be sustained, would then require an operation.

Dr. Mezera diagnosed the employee's condition as that of a sacroiliac sprain with the possibility of a protruded intervertebral disc in the lumbar region, and thought that the condition was chronic, and in all probability would require an operation at some time in the future. In his opinion the employee, as of the time of the hearing, had a 30% permanent partial disability of the body as a whole.

Dr. Palazzo concurred in Dr. Mezera's diagnosis of the employee's condition, and rated his disability, as of the time of the hearing, at from 20% to 25% of the body as a whole. While the doctor may not have stated in express terms that the employee's condition was permanent, his testimony gave no hint of improvement, but rather indicated the likelihood of the condition becoming worse, if what was then regarded as merely a protruded disc should actually become ruptured.

Thus far we have made no mention of the testimony of Dr. Richard A. Sutter, a witness for the employer, who testified that he had examined the employee on October 31, 1951, and that in his opinion the employee had nothing wrong with him at all.

■ It must be admitted that if the referee's award had stood, there would have been evidence to support his finding that the employee's disability had consisted of nothing more than a temporary total disability for the period of 5 weeks during the interval between his discharge from the hospital and his acceptance of employment with Chevrolet-Shell. The fact is, however, that the commission rejected the referee's finding; and his award is now of importance only in so far as being a part of the record, it is still a factor to be taken into account in determining whether the award of the commission itself is supported by competent and substantial evidence on the whole record. Michler v. Krey Packing Co., 363 Mo. 707, 253 S.W.2d 136; Clark v. Frazier-Davis Const. Co., Mo.App., 258 S.W.2d 934. It is the latter question with which this court is alone concerned, having in mind that the commission's findings cannot be set aside unless a consideration of the record compels the conclusion that the commission could not have reasonably made its findings from the evidence, and that its findings are clearly contrary to the overwhelming weight of the evidence. Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647; Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55.

■ Viewing the case from the latter angle, there is ample support for the commission's finding that as the result of the accident in question, the employee suffered a disability over and above the temporary total disability of 5 weeks covering the period he was away from work after leaving the hospital and before accepting employment by Chevrolet-Shell. Notwithstanding the injury which he had sustained 3 years previously when his foot slipped and caused him to be subjected to a strain while he was engaged with a fellow workman in carrying an acetylene tank, the employee testified that immediately before the present accident his back was "in good shape" and had "nothing wrong" with it. Indeed there is no claim by the employer that at the time of the accident the employee was unable to perform all the duties incident to his employment. Furthermore, the evidence shows that the previous injury,

though concededly painful, had not actually produced a compensable disability. The employer does not in anywise dispute the employee's statement that up until the present injury he had not been paid any monetary compensation. The commission was therefore entitled to find that the employee's condition at the time of the hearing before it was not the same as it had been before the accident, and that he had a disability due to the accident for which the employer was liable for compensation.

But while it would appear that the present injury had not prevented the employee from doing his full job, it had none the less made him potentially subject to such a disability as he later sustained, and both Dr. Mezera and Dr. Palazzo took his full history into account in rating the extent of his disability. In their opinion he had a permanent partial disability of from 20% to 30% at the time of the hearing, whatever may have been the entire cause to which it was to be attributed. In this situation it became the special province of the commission to determine from all the evidence before it the percentage of disability directly and solely attributable to the accident. Henderson v. Laclede Christy Clay Products Co., Mo.App., 206 S.W.2d 673; Johnson v. Fogertey Bldg. Co., Mo.App., 194 S.W.2d 924. The commission found a compensable disability of 15%, and the evidence reasonably sustains such conclusion.

Dr. Mezera was positive in his testimony that the employee's condition at the time of the hearing was one of permanent partial disability. That he none the less recognized the remote possibility of subsequent corrective measures did not prevent his testimony from showing the reasonable certainty of permanency that the law requires.

Within the limitations of our review there is no basis for disturbing the finding of the commission that as a result of the accident the employee had sustained a 15% permanent partial disability of the body as a whole.

The only other point has to do with the allowance of $12.24 as reimbursement for the cost of the sacro belt which the employee had purchased at the suggestion of Dr. Palazzo, and which the commission found was necessary to cure and relieve from the effects of the injury.

It is well settled that where an employer, with notice of the injury, refuses or neglects to provide the necessary medical aid or treatment which is required of him under Section 287.140, the employee may then make his own selection of the physician and secure his own necessary medical aid, and have the reasonable cost of the same assessed against the employer. Finn v. Harrison, Mo.App., 255 S.W.2d 93; Schutz v. Great American Ins. Co., 231 Mo. App. 640, 103 S.W.2d 904.

The disputed question here is whether the employer refused or neglected to provide medical aid.

We have already shown that the employer did permit the employee to go to an osteopath of his own choosing, and then took care of the osteopath's bill. However this procedure involved only a single treatment; and the difficulty came when the employee presented himself to the manager of his department for the hospitalization which the osteopath had recommended.

It is true that the manager advised the employee to report to him the following morning when arrangements would be made for him to go to the hospital. But the trouble was that when the employee did report the following morning, the manager was out of the city, and no one else representing the employer followed up the suggestion for hospitalization. Later on, after the employee had entered the hospital under Dr. Mezera's direction, one of the employer's officials remonstrated with him because he had entered the hospital on his own account, but this could not have served to alter the fact that the employer had not itself supplied the necessary hospitalization at the time the employee was first in need of immediate attention. The purchase of the sacro belt followed in the normal course of the treatment the employee received; and there is no suggestion by the

employer but that the belt was necessary to cure and relieve from the effects of the injury. The commission committed no error in requiring the employer to reimburse the employee for the cost of the belt.

It follows that the judgment of the circuit court affirming the award of the commission should in turn be affirmed by this court, and it is so ordered.

ANDERSON, P. J., and RUDDY, J., concur.